PETTIGREW, J.
|2The plaintiff, Jonea Krystal Lynn Thig-pen (Ms. Thigpen), licensed by endorsement to practice as a Registered Nurse (RN) in Louisiana, appeals a trial court judgment which affirmed an Amended Final Order of the Louisiana State Board of Nursing (Board). The Board’s order found that Ms. Thigpen violated provisions of the Louisiana Nurse Practice Act, La. R.S. 37:911 et seq., revoked her nursing license for nine months, and imposed other conditions — following completion thereof, that she would be given the opportunity to apply for a reinstatement of that license. For the reasons that follow, we amend the order to eliminate a prohibitory condition, and as amended, affirm.
FACTS AND PROCEDURAL HISTORY
Background Facts Leading to Investigation
Ms. Thigpen was licensed by the Board by endorsement to practice as an RN in Louisiana on October 10, 2001.[1] On or about November 3, 2010, the Board received a written complaint submitted by K.K.S., the daughter of W.K., a patient receiving home nursing care from Ms. Thigpen. K.K.S. reported that Ms. Thig-pen was “taking advantage of my father [W.K.] by convincing him to give her large amounts of money.” Attached to the complaint form, K.K.S., who stated she was also an RN, attached the following list of alleged incidents, supporting her claim that Ms. Thigpen was “consistently and continuously ... acting in a capacity beyond the authorized scope of nursing”.
1. She has a glass of wine in the evenings with patient[;]
2. She brings her personal and business paperwork to patient’s home to work on while she is caring for the patient[;]
3. She writes and signs checks from patient’s personal checking account, including payroll for workers that she has contracted, although she is not listed as a signer on the account!;]
4. She has convinced patient to lend/ gift her with money, office supplies, uniforms, refrigerator for medications, fax machine, laptop computer, file cabinets, as well as paying for rent for her office!;]
5. She has obtained a key to patient’s home as well as to his cabinet containing his checkbook.
IsThe Board promptly initiated an investigation of the allegations. Subsequently, it sent a letter informing Ms. Thigpen of the information it possessed that indicated she may have exceeded professional boundaries in violation of the Nurse Practice Act from February 2010, to the present. It also offered her an opportunity to reply within ten days of the letter, with a written explanation and supporting documentation to show compliance with all lawful requirements for the retention of her license.
Ms. Thigpen’s Position
Ms. Thigpen replied in a lengthy letter to the Board, in which she admitted receiving the amounts detailed above and that those payments were not for services rendered. She stated they were donations from W.K. to her company, Care Coordi *20 nation Center; and that both she and W.K., who was Chairman of the Board for her company, thought “it was perfectly legal to donate to a company as long as you reported it on your taxes as a donation and gave a statement of the donations.” Attached to her letter, she submitted the bank statements for her company, showing all deposits and expenditures. She also admitted to using W.K.’s credit card, but asserted that it was not for her own personal use, but was used with his permission, to pay for some of her company’s expenses.
She denied creating or falsifying any documentation for services rendered, explaining that when the investigation at her office was done, her office was also conducting its own internal audit. Unwittingly, she did not include some of the backup supporting documentation for certain dates; but, she later found and submitted the proper documentation.
With regard to the incidents of drinking wine with the patient, Ms. Thigpen again did not deny that on a few occasions, during the after-hours discussions about the business, W.K. had a 1/3 glass of wine, and she had a glass. She asserted, however, that this did not occur during any professional nursing visits. She further stated that she and W.K. “both thought that as co-owner and silent partner, chairman of the board, and aside from our nursing visits, that this was ok and perfectly legal.”
|4She further explained that she met W.K. before she became his nurse,[2] and due to his experience as a retired business owner, he was a great source of business advice to her regarding the opening of her own business. She stated W.K., told her he wanted to do something good for other people, that he believed strongly in the concept of the service her company would be offering the elderly, and that he offered to invest in the company but wished to be a silent partner. He ultimately agreed to be the Chairman of the Board of Directors for the company, continued to be involved in every step of the business, and she discussed all purchases for the company with him. She stated that she could not have started her business without the help of W.K. However, she also acknowledged that, notwithstanding the potential charges against her, she has not had any personal financial gain from the company, submitting evidence that her “annual pay” actually dropped after she started her own company.
Finally, she provided her detailed medical history and documentation to explain her intake of prescription pain medications. She asserted the medications were taken all under the direction and supervision of her treating physicians, and denied any abuse thereof. She also stated that her taking those medications did not have any negative impact on her ability to perform her nursing duties, and that in all of her years of nursing, there were no complaints of her having been impaired.
Formal Complaint by the Board
On July 19, 2011, the Board formally filed a complaint and charged Ms. Thigpen with violating the Nurse Practice Act and the rules and regulations promulgated pursuant thereto. In particular, the Board charged Ms. Thigpen with exceeding professional boundaries and unduly obtaining financial benefit from the nursing-patient relationship by accepting large sums of money from her patient and conducting increasing numbers of |Bpatient visits without justified patient need. The particulars of these charges are summarized as follows:
*21 (1) On or about 2/23/10, she accepted $5,000.00 from patient W.K.
(2) On or about 4/26/10, she accepted $5,000.00 from patient W.K.
(8) On or about 5/4/10, she accepted $5,577.50 from patient W.K.
(4) On or about 6/3/10, she accepted $5,525.00 from patient W.K.
(5) On or about 7/20/10, she accepted $600.00 from patient W.K.
(6) On or about 8/20/10, she accepted a donation in the amount of $1200.00 from patient W.K.
(7) On or about 10/1/10, she accepted $700.00 from patient W.K.
The Board asserted the foregoing payments were not for services rendered. Additionally, the Board asserted that on July 10, 2010, August 4, 2010, September 1, 2010, and October 1, 2010, Ms. Thigpen billed and accepted payments of $920.00, $910.00, $743.83, and $2275.00, respectively, for services purportedly rendered, but that she lacked documentation to support all of those charges and that many of those were for services rendered while the patient, W.K., was in the hospital, already receiving inpatient nursing care. The letter also informed Ms. Thigpen that during February 2010 through October 2010, she exceeded professional boundaries by having glasses of wine during nursing visits at the home of patient, WX; and, that during April 2010 through January 2011, she exceeded personal boundaries by repeatedly using the credit card belonging to patient, W.K., for her own personal use. Finally, the complaint charged Ms. Thigpen with the “chronic use of controlled medications [that] may potentially affect [her] ability to safely practice nursing.”
The complaint further stated that the facts constituted the following violations of the Nurse Practice Act and the rules and regulations promulgated by the Board:
—Respondent is unfit or incompetent by reason of negligence, habit, or other cause; La. R.S. 37:921(3);
—Respondent is guilty of moral turpitude. La. R.S. 37:921(8);
h — Respondent failed to practice nursing in accordance with the legal standards of nursing practice; L.A.C. 46:XLVII.3405(a);
—Respondent failed to utilize appropriate judgment, L.A.C. 46:XLVII.3405(c);
—Respondent misappropriated items of an individual, agency, or entity; L.A.C. 46:XLVII3405(i);
—Respondent falsified records; LAC. 46:XLVII.3405(j);
—Respondent failed to act, or negligently or willfully committed an act that adversely affects the physical or psychosocial welfare of the patient; L.A.C. 46:XLVII.3405(k);
—Respondent exceeded professional boundaries ...; L.A.C. 46:XLVII.3405(t);
Administrative Hearing and Findings
A hearing was held before a five-member panel of the Board on December 13, 2011, during which witnesses testified and evidence was submitted. On December 21, 2011, a final order was entered by the Executive Director of the Board, amended on January 23, 2012, finding that Ms. Thigpen violated the Nurse Practice Act in six respects: (1) La. R.S. 37:921(3) — is unfit or incompetent by reason of negligence, habit, or other cause; (2) L.A.C. 46:XLVII.3405(A)(a) — failed to practice nursing in accordance with the legal standards of nursing practice; (3) L.A.C. 46:XLVII.3405(A)(c) — failed to utilize ap *22 propriate judgment; (4) L.A.C. 46:XLVII.3405(A)(i) misappropriated items of an individual, agency, or entity; (5) L.A.C. 46:XLVII.3405(A)(k) — failed to act, or negligently or willfully committed an act that adversely affects the physical or psychosocial welfare of the patient; and (6) L.A.C. 46:XLVII.3405(A)(t) exceeded professional boundaries.
The Board found those violations constituted sufficient cause pursuant to La. R.S. 37:921 to suspend Ms. Thigpen’s license to practice as an RN in Louisiana, and ordered that it be suspended for a minimum of nine months, during which Ms. Thigpen shall refrain from working in any capacity as an RN, and following which she would have the opportunity to request license reinstatement after completion of the conditions also imposed, including submitting to comprehensive inpatient psychiatric, psychological and substance abuse evaluation, paying the Board a fine of $5,000.00, paying restitution to 17W.K. in the amount of $22,500.00, paying costs to the Board in the amount of $3,600.00 and expert witness fees of $6,000.00. Finally, Ms. Thigpen also was ordered (added by the amended order[3]), to “refrain from any involvement with and/or participation in any/all relationships of any kind with Patient WK from this point forward.”
Judicial Review of Board’s Amended Final Order
On January 27, 2012, Ms. Thigpen filed a Petition for Judicial Review with the district court of the Board’s final amended order. Upon motion by Ms. Thigpen, the trial court granted a stay of the order, pending judicial review thereof. On September 12, 2012, the district court held a hearing, and after argument of the parties, took the matter under advisement. On January 25, 2013, the court signed a judgment, upholding the ruling of the Board, finding Ms. Thigpen -violated the nursing practice act, specifically finding that her actions fell within the scope of “exceeding professional boundaries.” The court also upheld the board’s order of restitution and the imposition of a fine. However, the court ruled that the amounts assessed as costs and expert witness fees were arbitrarily fixed, and remanded the matter to the Board for a contradictory hearing to establish the amount of costs and expenses, including witness fees to be imposed upon Ms. Thigpen.
Ms. Thigpen now appeals the judgment of the trial court. She requested and was granted a stay by the trial court of the Board’s final amended order pending resolution of the appeal.
APPLICABLE LAW
Standard of Review
When reviewing an administrative final decision, the district court functions as an appellate court. An aggrieved party may obtain a review of any final judgment of the district court by appeal to the appropriate circuit court of appeal. On review of the | ^district court’s judgment, no deference is owed by the court of appeal to the factual findings or legal conclusions of the district court, just as no deference is owed by the Louisiana Supreme Court to factual findings or legal conclusions of the court of appeal. Consequently, this court will conduct its own independent review of the record and apply the standards of review provided by La. R.S. 49:964(G). Doc’s Clinic, APMC v. State ex rel. Dept. of Health and Hospitals, 2007-0480, pp. 8-9 (La.App. 1 Cir. *23 11/2/07), 984 So.2d 711, 718-719, writ denied, 2007-2302 (La.2/15/08), 974 So.2d 665. See also La. R.S. 49:965. An appellate court sitting in review of an administrative agency reviews the findings and decision of the administrative agency, not the decision of the district court. Raines v. Louisiana State Nursing Bd., 2012-1831, p. 2 (La.App. 1 Cir.6/7/13), 2013 WL 2488130(unpublished) writ denied, 2013-2048 (La.11/15/13), 126 So.3d 471.
Judicial Review of Administrative Decision
Judicial review of administrative decisions is governed by La. R.S. 49:964, which provides, in pertinent part:
G. The court may affirm the decision of the agency or remand the case for further proceedings, The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(6) Not supported and sustainable by a preponderance of evidence as determined by the reviewing court. In the application of this rule, the court shall make its own determination and conclusions of fact by a preponderance of evidence based upon its own evaluation of the record reviewed in its entirety upon judicial review. In the application of the rule, where the agency has the opportunity to judge the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency’s determination of credibility issues.
19Nurse Practice Act
The Board is responsible for overseeing the practice of registered nursing within the State of Louisiana and to meet the legislative .intent and purpose of the Nurse Practice Act of promoting, preserving, and protecting the public health, safety, and welfare of the citizens of this state, by regulating nursing education and practice and ensuring all individuals practicing under the title of “RN” be licensed and regulated. La. R.S. 37:911.
The grounds for disciplinary proceedings of registered nurses are set out in La. R.S. 37:921, which provides, in pertinent part (those provisions which Ms. Thigpen was charged with violating):
The board may deny, revoke, suspend, probate, limit, or restrict any license to practice as a registered nurse or an advanced practice registered nurse, impose fines, and assess costs, or otherwise discipline a licensee and the board may limit, restrict, delay, or deny a student nurse from entering or continuing the clinical phase of nursing education upon proof that the licensee or student nurse:
[[Image here]]
(3) Is unfit or incompetent by reason of negligence, habit, or other cause.
[[Image here]]
(8) Is guilty of moral turpitude
“Other causes” that may render a registered nurse “unfit” or “incompetent” have been delineated by the Board in La. Admin. Code, Title 46, Part XLVII, § 3405(A), in pertinent part, as follows:
*24 Other Causes — includes, but is not limited to:
a. failure to practice nursing in accordance with the legal standards of nursing practice;
[[Image here]]
c. failure to utilize appropriate judgment;
[[Image here]]
i. misappropriating items of an individual, agency, or entity;
[[Image here]]
lia)', falsifying records;
k. failure to act, or negligently or willfully committing any act that adversely affects the physical or psychosocial welfare of the patient ...;
t. exceeds professional boundaries, including but not limited to sexual misconduct; ....
(Emphasis added.) The Administrative Code further defines “professional boundaries” as “the limits of the professional relationship that allow for a safe therapeutic connection between the professional and the client.” L.A.C. 46:XLVII.3405(A).
DISCUSSION AND ANALYSIS
On appeal, Ms. Thigpen essentially maintains that the Board erred in finding she violated the Nurse Practice Act, because that act does not prohibit a nurse from entering into a business relationship with a patient. She objects to the characterization of that relationship as “improper” and contends that the Board cannot demonstrate a violation of the Nurse Practice Act or that, she overstepped her role as a nurse. She maintains that there is no rule in the act prohibiting a nurse-patient business relationship and that the Administrative Code, while including definitions for “other cause,” does not include a business relationship as a prohibited practice. In the alternative, she appears to assert that even if the Nurse Practice Act were not so vague (and a business relationship were prohibited), that the evidence in this case was insufficient to prove that she crossed professional boundaries. Finally, she asserts that the inclusion in the Board’s order prohibiting her from having any further contact whatsoever with W.K. violates her Constitutional First Amendment Right of Freedom of Association.
Exceeded Professional Boundaries?
Ms. Thigpen has admitted that she accepted monies and entered into a business relationship with W.K. At the outset, we reject Ms. Thigpen’s contention that because a nurse-patient business relationship is not listed in the Nurse Practice Act as prohibited conduct, that it cannot form the basis for disciplinary action thereunder. The clear language of the statute establishes that it is not exclusive; indeed, only sexual |nmisconduct is specified. A nurse may be unfit by reason of negligence, habit, or other cause. La. R.S. 37:921(3). The rules and regulations promulgated by the Board lists twenty-four specific acts or conduct that can constitute “other cause,” and again, this list is expressly non-exclusive. L.A.C.46:XLVIL3405(A). Thus, we find no merit to the contention on appeal that because it is not expressly prohibited, that a nurse-patient business relationship cannot be found to constitute a violation of the Nurse Practice Act.
Indeed, those very regulations define “professional boundaries” as “the limits of the professional relationship that allow for a safe therapeutic connection between the professional and the client.” Ms. Thigpen has never denied receiving and accepting more than $22,000.00 from W.K., and the evidence in the record amply supports that these payments (with the exception of the initial $5,000.00 cheek) were indeed made *25 to Ms. Thigpen by W.K during the time Ms. Thigpen was also W.K’s nurse. Ms. Thigpen maintains that all of the financial assistance she received from W.K. was used in the development of her company in which he was a silent partner. Thus, we now examine the evidence in the record to determine if the Board’s finding that Ms. Thigpen’s receipt of these funds and her business relationship with W.K. imperiled the “safe therapeutic connection between” her and W.K. such that her actions violated the Nurse Practice Act by exceeding professional boundaries.
EVIDENCE PRESENTED
Relationship Between Ms. Thigpen and W.K.
W.K’s daughter, K.K.S., filed the initial complaint with the Nursing Board and also testified at the hearing. She stated W.K. was ninety years old at the time of the hearing. She stated that she and her five siblings first met Ms. Thigpen when she was the home health nurse that attended their mother and W.K. at their home until her mother passed away, three years prior to the hearing. At that time, and up until W.K. began the “business relationship” with Ms. Thigpen, K.K.S. testified that she had been an RN for twenty years. She also helped with her parents, overseeing their care and helping with financial ac-countings. She stated that she and her father had always had a very close relationship that quickly began to deteriorate | i2when, shortly after the death of her mother, K.K.S. noticed and questioned W.K. about the unusual number of visits from, and checks that he was paying to, Ms. Thigpen, She also noticed that while Ms. Thigpen’s visits to the home when she was caring for her mother were always “strictly nursing responsibilities,” this all changed shortly after her mother died. While she understood that Ms. Thigpen would continue to come to the home to provide the same nursing services to W.K., K.K.S. was unaware that Ms. Thigpen would also be taking care of W.K’s expenses and personal errands. She stated that as an RN, she believed that the transfer of funds from W.K. to Ms. Thigpen was unethical; and that when she attempted to speak with W.K. about it, he told her it was none of her business. Shortly thereafter, W.K. removed K.K.S. from all of his banking accounts, refused her continued help with the finances, and gradually ceased all communication with her. Prior to the relationship ending, K.K.S. was able to make copies of all the checks W.K., wrote to Ms. Thigpen, as well as the credit card and bank statements, all of which were submitted into evidence at the hearing. K.K.S. testified that many of the signatures on the checks entered into evidence did not appear to be the true signature of her father, and that she was unaware that Ms, Thigpen had any signing rights to W.K./s checking accounts. K.K.S. testified that around that same time that she discovered the checks to Ms. Thigpen, she became aware that W.K. fired his long-term CPA because the CPA had also begun questioning him about the checks being paid to Ms. Thigpen. At that point, W.K. told the CPA he no longer needed his services,
K.K.S. also testified that she was concerned about the increased frequency of the visits to the home by Ms. Thigpen, many of which were not nursing related; and that in her opinion, she thought Ms. Thigpen was taking advantage of W.K’s decision making. Although she considered W.K. to be of sound-mind, she noticed that he believed everything Ms. Thigpen said and ceased listening to anyone else. She stated that W.K. always looked up to nurses and thought “what they said was God.” K.K.S. testified that shortly after W.K. *26 began seeing more of Ms. Thigpen, her relationship with W.K. deteriorated to a point of being non-existent in a short period of time.
11sDebbie Lacombe, W.K.’s housekeeper for seventeen years, also testified at the hearing. She stated that W.K. and his wife had become part of her family and that after W.K’s wife died, she “took [W.K.] under [her] wing,” trying to protect him more than before. She stated that she and W.K. had always had a very good relationship. However, shortly after W.K.’s wife died, Ms. Lacombe “started seeing things that just wasn’t right.” She explained she noticed the arrival of uniforms and other packages coming to the house that she later found out W.K. had purchased for Ms. Thigpen’s business. She noticed a much greater frequency of Ms. Thigpen’s visits to the house, and that these visits were now often conducted in the office at the house. She stated that she often overheard Ms. Thigpen telling W.K. that she needed help to pay her bills. Ms. Lacombe testified that she witnessed certain purchases W.K. made for Ms. Thigpen, including a refrigerator, filing cabinets, files, and folders. She stated she had witnessed Ms. Thigpen and W.K. drinking wine together at the house on one occasion, and that she was sent to purchase a bottle of wine approximately once every two weeks. She also testified that Ms. Thigpen sometimes ate at the house with W.K. and that other times, they would go out to eat together. She was also aware that W.K. had given Ms. Thig-pen his credit card. Ms. Lacombe testified that after W.K’s wife died, she thought Ms. Thigpen influenced W.K. a lot and that “he was different” and “just wasn’t the same anymore.” Ms. Lacombe stated she was becoming increasingly uncomfortable with the things she felt just weren’t right, and that, after W.K. uncharacteristically refused to pay her for being sick one day, she decided it was time to quit. She stated she just didn’t think he would ever do that to her, and she was not comfortable with how things had changed.
Dr. Linda Ledet, an RN and Associate Professor of Nursing at Nicholls State University, also testified at the hearing as an expert in the nurse/patient therapeutic relationship. She stated that she based her testimony on her own expertise, her review of the available literature addressing the nurse/patient professional boundaries, as well as the Board’s files and exhibits regarding the relationship between Ms. Thigpen and W.K.
114Pr. Ledet testified that the therapeutic nurse/patient relationship is “the foundation” of the nursing practice and exists for the sole purpose of meeting the patient’s needs. She testified that boundary issues or violations arise when a nurse is trying to get her own needs met as opposed to meeting the needs of a patient. She added that it is the nurse’s responsibility to maintain appropriate boundaries with a patient. She testified that in the relationship, the nurse is seen as powerful over the patient because he/she is providing care to the patient, while the patient is seen as vulnerable because he/she is the one in the need of services and care. That power imbalance imposes on the nurse, as the professional, to exercise diligence in maintaining the proper boundaries.
Specifically, with regard to the relationship at issue herein, Dr. Ledet found that not only the exchange of monies between Ms. Thigpen and W.K. to pay her bills and make financial contributions to her business was “problematic,” she also found that “Ms. Thigpen exhibited excessive self-disclosure about her personal life with [W.K.],” such that she considered the exchange of information upon which W.K. became aware of and interested in Ms. *27 Thigpen’s business also to be a violation of personal boundaries. Not only did Dr. Ledet find improper the dual (nurse/business) relationship between Ms. Thigpen and W.K., she also testified that the literature makes abundantly clear that it is improper and a boundary violation for a nurse to accept money and/or gifts from a patient, for whatever reason. She testified that even having W.K. as a business mentor while providing nursing services was a personal boundary violation. And even with a patient’s permission, she stated it was improper for a nurse to use a patient’s credit card for her own needs. She further found it improper for Ms. Thigpen to be consuming alcoholic beverages in any amounts and at any time with W.K. She found “problematic” the secretive nature of Ms. Thigpen and W.K.’s relationship, particularly to the extent that he ceased communications and relationships with his daughter, his CPA, and his housekeeper, all of whom, prior to Ms. Thigpen’s increased involvement, had enjoyed very good and close relationships with W.K. She testified that it is very important for a 11Bnurse to foster open communication and healthy relationships between a patient and his/her family and loved ones, not to separate or alienate them in any way.
Dr. Ledet summarized that her “rule of thumb” in determining the proper boundaries in a nurse/patient relationship was unless the actions or behaviors are something that would be documented in the nurse’s medical notes regarding the patient, then they are likely boundary violations. She emphasized that it makes no difference if the patient consents, or even suggests things outside the proper boundaries, because of the power imbalance alluded to before, as well as the fact that often times these violations can cause harm to a patient without the patient’s awareness. In this particular case, she opined that W.K. had already suffered harm due to the improper relationship with Ms. Thigpen, because he was in dispute with family members and had ended former long-term relationships that had been healthy and good for him due to those persons’ concerns over his relationship with Ms. Thigpen.
W.K. also testified at the hearing. He stated that it was his idea to donate money to Ms. Thigpen for her business; and when asked why, he responded, “The Good Lord says help your neighbor. And she was struggling.” He testified that Ms. Thigpen consulted him when she began running into problems with starting her business, and that he encouraged her to “[g]o for it.” He testified that he never felt forced, coerced, or threatened to help Ms. Thigpen, and that he did so of his own free will. He stated that, at his age, he was not concerned about sharing in any profits of the business, but that Ms. Thig-pen promised him that when the business started making money, she would see to it that he shared in those profits. He claimed that he allowed the housekeeper to quit because she was coming and doing less and less, and that he fired the CPA because he felt he was being overcharged. However, he admitted that both of those people, together with his daughter, were having problems with questioning the relationship and the monies he was giving Ms. Thigpen, and he thought it was none of their business.
Finally, Ms. Thigpen testified on her own behalf. She explained the “guided care” concept of nursing care upon which her business was modeled, and testified that 116proactive monitoring and assessing the patients at home, and addressing concerns and coordinating with doctors on the front end was at the core of that business model, with the goal of catching things early. She testified that empowering the patient for self-management and educating *28 the patient was also a large component of that model. Thus, she explained that the increased visits and her private hiring to coordinate nursing care, even while a patient is in the hospital and receiving in-hospital nursing care, was also a large component of the services provided by her company.
Again, Ms. Thigpen did not deny receiving over $22,000.00 in financial assistance from W.K., but testified she believed that “as long as you kept business separate from nursing that it was legal, that everything was appropriate.” She stated that she kept her nursing visits and her business visits to W.K. separate. She also testified that she was aware of “arguments” among W.K’s family members over the will and financial issues, which is why initially W.K., did not want his name on any of their business deals, but that after she became aware of the Board’s investigations and concerns, she drew up new business plans to document W.K.’s role in the business. However, she testified that when she became aware that those changes did not alter the Board’s position, she voluntarily ceased engaging in business with W.K. and no longer treated him as a patient.
Analysis/Application
As noted earlier, in reviewing the propriety of the trial courts judgment this court conducts its own independent review of the record and applies the standard of review provided in La. R.S. 49:964. Based on the evidence detailed above, we find ample evidence to support the Board’s findings that the totality of the facts and circumstances, surrounding the relationship between Ms. Thigpen and W.K. constitute several violations of the Nurse Practice Act and the relevant Administrative Code provisions as found by the Board and affirmed by the trial court. La. R.S. 49:964(G)(6). With the exception of one of the conditions imposed on Ms. Thigpen— addressed below — we conclude the Board’s findings do not violate constitutional or statutory provisions (La. R.S. 49:964(G)(1)); they are not in excess of the Board’s authority (La. R.S. 49:964(G)(2)); they were made upon lawful procedure (La. R.S. 49:964(G)(3)); are not affected by error of law (La. R.S. 49:964(G)(4)); and are not arbitrary, capricious, or an abuse of discretion (La. R.S. 49:964(G)(5)). Accordingly, with the exception of the amendment discussed below, the trial court’s judgment affirming the Board’s order is affirmed.
Unconstitutional Condition
In its Amended Final Order, the Board added a restraining order to Ms. Thigpen that it stated was intended to be included but was inadvertently omitted from its final order — that Ms. Thigpen “refrain from any involvement with and/or participation in any/all relationships of any kind with Patient WK from this point forward.” We find this amendment to be overreaching of the Board’s authority (La. R.S. 49:964(G)(2)), as well as unconstitutionally infringes on Ms. Thigpen’s right of freedom of association. The Board is empowered to monitor and regulate Ms. Thig-pen’s actions only in her role as an RN, and in accordance with the Nurse Practice Act. We note that the restraining order prohibiting any and all contact with W.K. is imposed on Ms. Thigpen pursuant to the final amending order during a time in which her license is suspended, and over which the Board has no authority to regulate or monitor. As such, we find it is outside the Board’s statutory authority and constitutes an unwarranted infringement oh Ms. Thigpen’s personal freedom to associate and have relationships of her choosing Accordingly, we amend the Board’s order by vacating that restraining order. If this restraining order had been *29 added as a condition to her reinstatement of her license, then it may have passed legal muster, but it is not stated to be a condition of her reinstatement.
PENDING MOTIONS
We now address the motions pending in this appeal:
Motion by Ms. Thigpen to supplement the record with evidence later received and Motion for Leave to Present Additional Evidence
These motions were filed October 15, 2013 and December 16, 2013, respectively, and seek to introduce evidence that was received after the hearing 11sregarding W.K.’s interview by Elderly Protection Services, which Ms. Thigpen claims exonerates her on the charge the she personally used W.K.’s credit cards. The evidence was admittedly obtained after the hearing and was not included in the Board’s review. The motions also claim that a certain binder of evidence that was before the Board was not included in the appellate record. To the extent that some of the evidence Ms. Thigpen claims is missing was not introduced at the hearing and considered by the Board, the evidence is not properly before us. This court has already ruled on a prior motion by Ms. Thigpen to supplement the record with evidence not included in the appellate record, denying said motion on the basis that this court can not review evidence that is not in the appellate records nor can it receive new evidence. La. R.S. 49:964(F); See Thigpen v. Louisiana State Board of Nursing, 2013 CA 0841 (La.App. 1 Cir. 10/08/13)(unpublished). For those same reasons, the pending motion to supplement is denied.[4]
Board’s Motion To Strike Reply Brief
The Board also filed a motion to strike the reply brief of Ms. Thigpen to the extent that it refers to evidence outside the record, notably, the evidence sought to be supplemented in her own motions. For the reasons stated above, the Board’s motion is hereby granted insofar as this court did not review those portions and arguments in brief regarding evidence not properly before it.
COSTS AND EXPERT WITNESS FEES
The Board assessed administrative costs and expert witness fees for Dr. Ledet to Ms. Thigpen. The trial court found that the assessment of those costs was proper, but remanded to the Board for a hearing, finding that the amounts were assessed in an arbitrary manner and not established with supporting evidence. In the interim, Ms. Thigpen requested and was granted a stay of the Board’s order and the trial court judgment pending the appeal of this matter. The appeal being concluded, the stay is hereby lifted, and this matter is remanded in accordance with the trial court’s judgment |19to the Board for a hearing to submit evidence and establish the appropriate assessment of costs and expert witness fees against Ms. Thigpen.
CONCLUSION
Accordingly, the judgment of the trial court, which affirmed the final amended order of the Board is hereby amended to omit the condition that Ms. Thigpen refrain from any contact, communications, or relationship with W.K. In all other respects, the judgment is affirmed. The Motions to Supplement the record are hereby *30 denied; the motion to strike the reply brief is hereby granted to the extent that it contains argument and evidence not before the Board; and the matter is remanded to the Board for further hearings consistent herewith. Costs of this appeal are assessed to the plaintiff, Jonea Krystal Lynn Thigpen.
AMENDED, AFFIRMED AS AMENDED. REMANDED TO BOARD. MOTIONS TO SUPPLEMENT DENIED; MOTION TO STRIKE REPLY BRIEF GRANTED IN PART.
McCLENDON, J., concurs and assigns reasons.

. We note that in several of the pleadings contained in the record and also in the final order of the Board, the year of Ms. Thigpen’s licensure is incorrectly stated as 2010. However, the license itself is contained in the record confirming the correct year to be 2001.

. Ms. Thigpen was the home health nurse assigned years ago to care for W.K.'s wife until her death approximately three years pri- or to the administrative hearing in this case.

. The Board represented that this amending condition should have been included and was inadvertently omitted from the final order.

. We do note that many of the items Ms. Thigpen claims are not in the appellate record, are indeed included in the record, and were reviewed by this court in deciding the issues before it.